[No. C074019. Third Dist. Apr. 30, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE JACKIO, Defendant and Appellant.

## COUNSEL

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, Acting P. J.**—Convicted of attempted murder and other crimes associated with a home invasion and sentenced to both determinate and indeterminate terms in state prison, defendant Lawrence Jackio contends on appeal that his waiver of his right to counsel, under which he represented himself at trial, was inconsistent with his Sixth Amendment rights because the trial court did not outline the possible terms of imprisonment for the

various crimes and enhancements charged against him. Instead, the trial court simply advised defendant that he risked life in prison if he was convicted.

In the published part of this opinion, we conclude that, under the circumstances, the trial court's advisement adequately warned defendant of the risks of self-representation.

In the unpublished part of this opinion, we find no merit in defendant's remaining contentions. We therefore affirm the judgment but remand to the trial court to correct a clerical error in the abstract of judgment.

FACTS

We recount the evidence in the light most favorable to the jury's verdicts. For example, even though neither of the victims was able to identify defendant as one of the assailants, we refer to him by name from the outset because there was ample evidence that he was one of the assailants.

Early in the morning on June 16, 2011, defendant and Rashid Deary-Smith entered the garage of a house where Martez Laster and Antonia Branch lived together with their one-year-old son. Between 2:00 and 3:00 a.m., Branch, who had been out that night, approached the residence in her car with her son in the backseat. She opened the garage door with a remote control from her car and drove into the garage. In the garage, Branch closed the garage door with the remote control and went around her car to get her son out of the backseat. Defendant and Deary-Smith approached her, pointed guns at her, and told her to open the door leading into the house. One of the men, probably Deary-Smith, hit Branch in the head with his gun, opening up a wound that required five staples to close.

Laster, who was inside the house, heard the commotion in the garage and grabbed his .40-caliber handgun. He went to the door that connects the garage to the interior of the house, unlocked it, and began to open it. As he was opening the door, he was rushed by defendant and Deary-Smith. Laster took a couple of steps back and was shot in the side, so he returned fire. Defendant and Deary-Smith retreated into the garage.

Both defendant and Deary-Smith had been hit by gunfire from Laster. Deary-Smith was hit in the head and fell to the floor of the garage, and defendant, who was hit in the leg, escaped out the side door of the garage. Meanwhile, Branch got back into her car, put the car in reverse, and backed up through the closed garage door.

A neighbor saw defendant flee. Defendant limped along, leaving a trail of blood and dragging himself to a car. He got into the car and drove away. A

subsequent medical examination revealed that defendant was hit twice in the leg, with one of the bullets breaking his femur. Defendant had gunshot residue on his hands and pants. The DNA in the trail of blood from the house to the car matched defendant's DNA profile. Also along the trail of blood between the house and the car, defendant dropped a nine-millimeter handgun.

When law enforcement arrived at the house, Deary-Smith was still on the floor of the garage. He had zip ties in his pocket, and a loaded .45-caliber semiautomatic handgun was on the ground next to his head. No spent .45-caliber casings were found at the house—evidence that Deary-Smith did not fire the gun. Separate DNA samples from the gun matched Deary-Smith's and Branch's DNA profiles.

Later that day, when the owner of the car that defendant had driven away from the house looked into her car, she found blood and defendant's wallet. The blood was also identified as defendant's through DNA testing.

Two expended casings from a nine-millimeter gun were found, one in the house and one in the garage. They matched the gun left by defendant as he dragged himself to the car after the shootings.

Defendant testified in his own defense. He admitted that he was at the house in question when the gunfire erupted. He claimed, however, that he had taken Deary-Smith there to meet Deary-Smith's cousin. While defendant was waiting in front of the house, he saw someone back out through the garage door, heard gunshots, and realized he had been hit. He dragged himself to the car and drove away.

## PROCEDURE

A jury convicted defendant of first degree burglary (Pen. Code, § 459; count one); two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts two and four); attempted murder (Pen. Code, §§ 664, 187, subd. (a); count three); two counts of attempted first degree robbery (Pen. Code, §§ 664, 211; counts five and six); and being a felon in possession of a firearm (Pen. Code, former § 12021, subd. (a)(1); count seven). The jury also found true various arming, discharge, and great bodily injury allegations. In a bifurcated proceeding, the trial court found that defendant had a prior serious felony conviction. The court sentenced defendant to a determinate term of 19 years four months in state prison, with a consecutive indeterminate term of 50 years to life.

Additional facts and proceedings are recounted as they are relevant to the discussion of defendant's contentions on appeal.

## DISCUSSION

### I

### Faretta *Waiver*

Before trial, defendant decided to represent himself, which prompted the trial court to warn defendant of the dangers of self-representation, including the possibility that he faced, in the trial court's words, "life in prison." Defendant contends that, when he moved to represent himself, the trial court failed to give him an adequate breakdown of what punishment he was facing if convicted. He argues that, under these circumstances, his waiver of the right to counsel was not knowing and voluntary under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).

Defendant's contention raises two issues.

First, what notice does the Sixth Amendment require concerning the penalty faced if the defendant is convicted? Does it require a breakdown of the full range of sentencing options with respect to the crimes and enhancements charged? Or does it simply require the court to notify the defendant concerning the maximum penalty he faces? We conclude that it is the latter—that the court need notify the defendant only of the maximum penalty he faces.

██ And second, did the trial court's waiver colloquy in this case adequately notify this defendant of the maximum penalty he faced if convicted? We conclude that, by informing defendant that he faced life in prison as a penalty for the crimes and enhancements charged, the court adequately notified defendant of the possible penalty he faced if convicted.

Because the trial court's advisement concerning the penalty was adequate, defendant's waiver of the right to counsel was knowing and voluntary, and there was no violation of his Sixth Amendment right to counsel.

### A. *Procedural Background*

On March 23, 2012, defendant signed a *Faretta* waiver form which included the following statement: "Penalties for offense if found guilty are life in prison." The underscored part of the statement was handwritten. After a preliminary hearing on April 16, 2012, however, defendant requested and was granted appointment of counsel.

On May 18, 2012, defendant appeared before the court on a new *Faretta* motion. Defendant said that he was a high school graduate and had finished almost a year of college. The court went through the normal litany of admonitions about representing oneself in a criminal action. (Defendant does not claim on appeal that the admonitions were deficient, except as discussed here.) The relevant colloquy is as follows:

"THE COURT: . . . You do understand the penalties for the offenses for which you've been charged could carry up to a life sentence[?] [¶] *Do you understand that?*

"THE DEFENDANT: *Yes.*" (Italics added.)

The court provided another *Faretta* waiver form, which defendant signed, with the following statement: "Penalties for offense if found guilty are <u>life</u>." Again, the underscored portion was handwritten. The form listed the code sections for the crimes charged in the information, but it did not list any code sections for enhancements.

The court found that defendant had made a knowing and voluntary waiver of his right to counsel.

### B. *Sixth Amendment Jurisprudence*

■ The Sixth Amendment of the United States Constitution guarantees a defendant both (1) the right to be represented by counsel at critical stages of the prosecution and (2) the right to represent himself, if he so elects. (*Faretta, supra*, 422 U.S. at p. 819; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 [119 Cal.Rptr.2d 859, 46 P.3d 335] (*Koontz*).) However, we must indulge every reasonable inference against a defendant's waiver of the right to counsel. (*Brewer v. Williams* (1977) 430 U.S. 387, 404 [51 L.Ed.2d 424, 97 S.Ct. 1232]; *Koontz, supra*, 27 Cal.4th at p. 1069.)

A valid waiver includes (1) a determination by the court that the defendant has the mental capacity to understand the proceedings (which is not an issue in this case) and (2) a finding that the waiver is knowing and voluntary, which entails a finding that the defendant understands the consequences of the decision and is not being coerced. (*Godinez v. Moran* (1993) 509 U.S. 389, 400–401 & fn. 12 [125 L.Ed.2d 321, 332–333 & fn. 12, 113 S.Ct. 2680]; *Koontz, supra*, 27 Cal.4th at pp. 1069–1070.)

"In order to make a valid waiver of the right to counsel, a defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is

doing and his choice is made with eyes open." [Citation.]' (*Faretta, supra,* 422 U.S. at p. 835.) No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citation.]" (*Koontz, supra,* 27 Cal.4th at p. 1070.)

Our role on appeal after a defendant has defended himself under *Faretta* and now claims that his waiver of the right to counsel was made without being adequately advised of the dangers and disadvantages of self-representation is to examine the whole record to determine de novo whether the waiver was valid. (*Koontz, supra,* 27 Cal.4th at p. 1070.)

### C. Analysis

#### 1. What does the Sixth Amendment require?

As noted, defendant was warned that he could be sentenced up to life in prison if convicted. On appeal, he claims, however, that the advisement was inadequate because the trial court was required to advise him of the full range of punishments he could face for the crimes and enhancements charged.

Defendant relies primarily on a decision of the Ninth Circuit of the United States Court of Appeals in making his contention that the advisements here were inadequate. But we are not bound by that decision. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Therefore, although we will discuss the Ninth Circuit decision later, we start with the jurisprudence of the California Supreme Court and the United States Supreme Court.

No case of the California Supreme Court directly answers the specific question posed in this case: whether a defendant wishing to represent himself at trial must be advised of the full range of punishments he could face if convicted. However, in 2002, the court held that a trial court did not err in giving advisements when it instructed a defendant who wanted to represent himself at trial that he faced the death penalty. (*Koontz, supra,* 27 Cal.4th at pp. 1069–1073.) Obviously, the sentence could have been life without parole, even if he was convicted of all the crimes, because the death penalty is not mandatory for any crime in California. (See Pen. Code, § 190.) But in *Koontz,* the court did not discuss specifically the advisement concerning the possible penalty if the defendant was convicted. Instead, it rejected the defendant's contentions that (1) the trial court did not adequately warn him of

the disadvantages of not having an attorney represent him and (2) the defendant was mentally unfit to comprehend the risks of representing himself. (*Koontz, supra,* 27 Cal.4th at pp. 1072–1073.) A case is not authority for a proposition not considered. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

A 2009 California Supreme Court case summarized the law generally applicable in these circumstances: " 'A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." (*Faretta, supra,* 422 U.S. at p. 835.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]" (*People v. Burgener* (2009) 46 Cal.4th 231, 241 [92 Cal.Rptr.3d 883, 206 P.3d 420] (*Burgener*).)

Likewise, no decision of the United States Supreme Court answers the specific question presented by defendant here. However, in 2004, the high court provided guidance concerning the necessary advisements in a different procedural setting—when a defendant desires to represent himself to enter a guilty plea. (*Iowa v. Tovar* (2004) 541 U.S. 77 [158 L.Ed.2d 209, 124 S.Ct. 1379] (*Tovar*).)

In *Tovar,* the defendant said during pretrial proceedings that he wanted to represent himself and to plead guilty. The trial court engaged in a guilty plea colloquy, advising the defendant of the rights he must waive to plead guilty, but the court did not advise the defendant under *Faretta* of the dangers and disadvantages of self-representation. The Iowa Supreme Court found that the trial court's advisements were deficient because the court did not warn the defendant that by representing himself he might overlook viable defenses and would not have the opportunity to obtain an independent opinion of whether he should plead guilty. (*Tovar, supra,* 541 U.S. at pp. 81–84.)

On review, the *Tovar* court held that the advisements required by the Iowa Supreme Court are not required by the United States Constitution. Instead, "[t]he constitutional requirement is satisfied when the trial court informs the

accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of *the range of allowable punishments attendant upon the entry of a guilty plea.*" (*Tovar, supra*, 541 U.S. at p. 81, italics added.)

The *Tovar* court emphasized that the central component for a valid waiver is that the defendant knows what he is doing because he has been warned of the hazards ahead. But there is no prescribed script. (*Tovar, supra*, 541 U.S. at pp. 88–89.)

The difference in procedural settings of this case and *Tovar* is significant. In *Tovar*, the defendant was pleading guilty. Here, a trial lay ahead.

■ *Tovar*'s requirement that a defendant desiring to represent himself in order to enter a guilty plea be advised of "the range of allowable punishments attendant upon the entry of a guilty plea" cannot practically be applied to a defendant desiring to represent himself at trial. The essential difference is that, while in a guilty plea setting the crimes and enhancements for which the defendant can be punished are known, in a case such as ours where the defendant is going to trial the jury may or may not convict the defendant of the crimes or find true the enhancement allegations. This makes it impractical to try to predict the possible terms and enhancements that will eventually be available to the trial court at sentencing.

When a defendant represents himself, he may be acquitted, which means he will not be subject to punishment. On the other hand, he may be convicted of all the crimes charged, with true findings on all the enhancements. In that case, the court may impose the maximum punishment for the crimes and enhancements charged. Also, the jury may convict on some counts and acquit on others or convict of lesser included crimes, and the jury may do the same with the enhancement allegations. If the defendant is convicted and enhancements are found true, the court may strike or stay some of the punishment or select lower terms. In other words, a requirement that a trial court advise a defendant desiring to represent himself at trial of the full range of possible punishments would require the trial court to start with no punishment for acquittal and work its way through the virtually endless permutations and combinations of terms, ending with the maximum possible punishment. Merely to state it demonstrates the unworkability of requiring the court to advise the defendant as to every possible punishment.

■ Instead, the most reasonable solution consistent with case law and the United States Constitution is to require the trial court to advise a defendant

desiring to represent himself at trial of the maximum punishment that could be imposed if the defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself. By so advising, the trial court puts the defendant on notice that, by representing himself, he is risking imposition of that maximum possible punishment. The defendant who decides to represent himself after this advisement proceeds with his " 'eyes open' " and understands the dangers of self-representation, at least with respect to the possible punishment. (*Faretta, supra*, 422 U.S. at p. 835; see *Burgener, supra*, 46 Cal.4th at p. 241.) Neither the Constitution nor interpretive case law requires more.

### 2. *Was the advisement in this case adequate?*

With this understanding, that an advisement of the maximum possible punishment satisfies the federal Constitution's requirements with respect to a *Faretta* colloquy, we turn to the advisement given in this case. Defendant contends that it was deficient because the trial court's statement that he faced life in prison was ambiguous. We disagree.

On appeal, defendant argues: "The court's advisement that [defendant] faced . . . 'life' is too ambiguous in light of the various meanings of life, as well as the fact that [defendant] was in fact facing onerous 25-to-life sentences, along with doubled sentences under the Three Strikes statutes."

The focus of our review of the adequacy of a specific *Faretta* advisement is what the defendant understood from the advisement. (See *People v. Welch* (1999) 20 Cal.4th 701, 733 [85 Cal.Rptr.2d 203, 976 P.2d 754].) We conclude that the advisement here successfully apprised defendant that, if he were convicted, he could spend the rest of his life in prison.

Three statements are at issue here. The first *Faretta* waiver form instructed defendant that "[p]enalties for offense if found guilty are life in prison." (Underscoring omitted.) Later, during the second *Faretta* proceedings, defendant expressly stated that he understood he could be sentenced "up to a life sentence." And finally, the second *Faretta* waiver form instructed defendant that "[p]enalties for offense if found guilty are life." (Underscoring omitted.)

These statements, taken together, were clear that defendant's punishment could amount to "life in prison," meaning incarceration for the rest of his life. Nothing in the record leads us to conclude otherwise.

However, defendant asserts that, because a "life" term under California law can mean so many different things, we must conclude that the advisement was ambiguous and did not successfully convey to defendant that a conviction might result in incarceration for the rest of his life.

Defendant seeks to equate the court's use of the word "life" with the statutory indeterminate term of life with parole, which allows for parole after seven years. Penal Code section 3046 provides that a prisoner "under a life sentence" may be paroled after seven years. But defendant gives no good reason for us to believe that he reasonably understood the court's advisement to refer to Penal Code section 3046. The advisement did not refer to that code section but instead made a very simple statement about the length of time defendant could be incarcerated.

We also see no relevance of the fact that defendant was facing possible determinate and indeterminate terms or that he could be subject to consecutive terms of 25 years to life for the firearm discharge allegations. Defendant argues that the trial court was required to provide these details, but the United States Constitution does not require an advisement concerning these permutations and combinations, as we already discussed.

Finally, we consider defendant's primary cited authority—*U.S. v. Erskine* (9th Cir. 2004) 355 F.3d 1161 (*Erskine*). That Ninth Circuit decision is different on its facts and distinguishable on the law, in addition to not being binding on us. In *Erskine*, the trial court mistakenly informed the defendant during a *Faretta* colloquy that he faced a possible one-year incarceration, even though it was possible that the punishment for his crimes would be five years. (*Id.* at p. 1165.) The Ninth Circuit held that it could not conclude that the defendant's *Faretta* waiver was knowing and voluntary because of this error in the *Faretta* colloquy. (*Erskine, supra,* 355 F.3d at p. 1171.) Here, on the other hand, there was no error in the *Faretta* colloquy; therefore, the holding of *Erskine* does not support reversal in this case.

We conclude that the *Faretta* colloquy in this case did not violate defendant's Sixth Amendment right to counsel.

II–IX[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante,* page 445.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the clerical error in the abstract of judgment to conform to the sentence imposed and to send the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

Hull, J., and Murray, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 12, 2015, S226814.